IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MEERAN ALBADIRY,           )
                             )
v.                           )        No. 3:13-0840
                             )
CAROLYN W. COLVIN,      )
     Acting Commissioner of   )
     Social Security           )


To: The Honorable Aleta A. Trauger, District Judge


# REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income benefits ("SSI"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 23) should be DENIED.


# I. INTRODUCTION

On June 22, 2010, the plaintiff protectively filed for SSI, alleging a disability onset date of September 16, 2007, due to "a broken spine, left leg numbness, thyroid problems, and anxiety."

(Tr. 44, 83, 110-18, 126, 130, 146.) Her application was denied initially and upon reconsideration. (Tr. 59-60, 75-78, 81-83.) The plaintiff testified at a hearing before Administrative Law Judge Linda Gail Roberts ("ALJ") on February 17, 2013, and the ALJ subsequently entered an unfavorable decision.[1] (Tr. 8-38, 44-54.) On June 25, 2013, the Appeals Council denied the plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)

## II. BACKGROUND

The plaintiff was born on November 14, 1975, and she was 34 years old as of her application date. (Tr. 13-14.) She is an Iraqi refugee who graduated from college and worked as an elementary school teacher in Iraq. (Tr. 14, 16, 26-27, 138.) The plaintiff alleged a number of physical impairments that were the primary focus of the ALJ's decision. However, in this Court, the plaintiff only raises issues pertaining to her alleged mental impairments. *See* Docket Entry No. 24, at 15-22. Consequently, the Court will focus its review of the medical evidence and hearing testimony on the plaintiff's alleged mental impairments.

### A. Chronological Background: Procedural Developments and Medical Records

On November 16, 2010, the plaintiff presented for mental health treatment to Centerstone Community Mental Health Center ("Centerstone") where she was seen by Meryl Taylor, a certified master social worker. (Tr. 260-63.) At her initial intake assessment, the plaintiff complained of

---

[1] The ALJ's decision is dated April 17, 2012. (Tr. 41-54.) However, the Court assumes that the decision was really entered on April 17, 2013.

having nightmares, trouble sleeping, depression, and symptoms of post-traumatic stress disorder ("PTSD"). (Tr. 262.) She related that she had moved to the United States one and a half years earlier and that Arabic was her first language. (Tr. 260.) She said that she taught English in Iraq but "had to sign a 'loyalty' paper to the government" and was "[n]ot allowed to keep anything from" the government. (Tr. 262.) She said that her brother was imprisoned for political reasons, which caused her to be fired from her job. *Id.* She explained that she "witnessed a lot of violence in Iraq" and that she and her husband were injured when their car "was bombed with family in it because [her] husband was working for an American company." *Id.*

The plaintiff complained of "appetite disruption, eating too much or too little, sadness, crying, fatigue, loss of pleasure, difficulty with concentration, constant intrusive thoughts, flashbacks, re-experiencing trauma, . . . rapid heartbeat, difficulty breathing, fearful[ness], isolative behavior, little socializing, feelings of hopelessness, loss of future expectations, [and] difficulty trusting people." *Id.* She denied experiencing anger, suicidal or homicidal ideation, or hallucinations. *Id.* During a mental status examination, she had appropriate behavior, appearance, and mood; was well-oriented; and had normal thought content and process. *Id.* Her judgment, insight, and motivation for treatment were described as "unclear," and she demonstrated "vegetative disturbance[s]" of appetite, crying, energy, interest, pleasure, and sleep. *Id.*

Ms. Taylor diagnosed the plaintiff with chronic PTSD and noted that she was "willing to participate in recommended treatment of therapy and medication" and had an expected length of treatment of "approximately 12-18 months." (Tr. 262-63.) Ms. Taylor also observed that her "[p]rognosis is good, although ongoing problems in Iraq are likely to exacerbate current symptoms at times." (Tr. 263.) A Tennessee Clinically Related Group ("CRG") form completed by

Ms. Taylor[2] assessed the plaintiff as having moderate limitations in the areas of activities of daily living, interpersonal functioning, adaptation to change, and concentration, task performance, and pace, and she was assigned a Global Assessment of Functioning ("GAF") score of 55.[3] (Tr. 257-59.)

At a therapy session on December 2, 2010, the plaintiff reported that she had difficulty trusting people (tr. 268), and Ms. Taylor added an Axis-IV diagnosis, noting that the plaintiff's recent move to the United States had caused her some social problems. (Tr. 271.) On December 30, 2010, the plaintiff reported that she was "about the same" but that her "sleep [was] worse." (Tr. 265.) She also reported that she was "fearful of speaking English due to trauma in Iraq" and did not like being around other people. *Id.* She failed to show up for a January 24, 2011 appointment. (Tr. 266-67.)

From February to December 2011, the plaintiff received medication, but not counseling, at the Precision Pain Center for anxiety and depression. (Tr. 47, 343-70.) She was prescribed Cymbalta for depression, but it was discontinued because the plaintiff could not tolerate it. (Tr. 360, 364.)

In disability function reports, the plaintiff indicated that she had a "constant feeling of anxiety and frustration" (tr. 164) and that she "became nervous" and sometimes could not "do anything," could not "contact with people" and felt "tired" and "stress[ed]." (Tr. 146.) She reported that she went grocery shopping once a week with her husband for "about one hour" (tr. 149) and that she

---

[2] The CRG assessment is unsigned but Ms. Taylor indicated in a treatment note that she completed the assessment. (Tr. 270.)

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV–TR"). A GAF score between 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

went to the "gardens" once a week with her husband and children.  (Tr. 150.)  In one report she indicated that she took care of her children with her husband's help (tr. 147), but in another report she indicated that her husband took care of the children without her help.  (Tr. 165.)  She related that she could make sandwiches and frozen dinners but could not cook or make meals.  (Tr. 148, 166.)

At a psychiatric evaluation at Centerstone on February 18, 2011, the plaintiff arrived with a friend who translated for her.  (Tr. 316-20.)  The plaintiff explained that she spoke English and had a degree in English, but was afraid to speak the language because, while in Iraq, she "was accused of hiding info about her brother."  (Tr. 316.)  She complained of symptoms of anxiety, depression, poor sleep, decreased appetite, poor concentration, low motivation, anhedonia, history of trauma, flashbacks, and nightmares.  *Id.*  She said that she had never taken mental health medication or received in-patient psychiatric care.  *Id.*  She reported that she did not work and did not have any hobbies or activities but that she got along well with her family.  (Tr. 316, 318.)  The psychiatric evaluator noted that she was "easily engaged" and "smiled at times" and prescribed Zoloft.  (Tr. 319-20.)

At a therapy session on February 18, 2011, the plaintiff demonstrated no improvement towards goals and reported that she was "afraid to go anywhere," "afraid the police will arrest her and . . . afraid of the future."  (Tr. 332.)  She said that she "like[d] to stay home because she feels safe" but acknowledged feeling "bored and lonely."  *Id.*  On March 18, 2011, the plaintiff reported that she was experiencing paranoia, headaches, and nausea and had stopped taking Zoloft after three days on the medication, and she was prescribed Remeron as an alternative.  (Tr. 328-29.)  In March and April, the plaintiff cancelled three scheduled appointments.  (Tr. 324-27.)

On April 11, 2011, Dr. Celine Payne-Gair, Ph.D., a Tennessee Disability Determination Services ("DDS") nonexamining psychiatric consultant, completed a Psychiatric Review Technique ("PRT") and mental Residual Functional Capacity assessment ("RFC"). (Tr. 283-96; 371-74.) In the PRT, Dr. Payne-Gair found that the plaintiff had PTSD (tr. 288) and opined that she had mild restrictions of the activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 297.) In the mental RFC assessment, Dr. Payne-Gair opined that the plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Tr. 371-74.) At the end of the assessment, Dr. Payne-Gair further explained that the plaintiff: (1) "can remember locations and simple work-like procedures and can understand and remember simple and detailed instructions;" (2) "can complete simple and detailed tasks, maintain attention and concentration for periods of at least two hours, adequately maintain workday/workweek and pace, and make simple decisions;" (3) "can relate appropriately to peers and supervisors;" and (4) "can adapt to routine workplace changes." (Tr. 373.)

The plaintiff was discharged from Centerstone on June 20, 2011, after she "stopped coming for appointments." (Tr. 309-10.) She returned on January 4, 2012, reporting an "[i]ncrease in anxiety symptoms . . . [and a] continuation of depression and PTSD." (Tr. 383.) She indicated that she "[s]topped services previously in part due to stigma attached to getting mental health [treatment]." *Id.* Ms. Taylor noted that the plaintiff's "[p]rognosis [was] fair given cultural issues that may interfere with treatment, including stigma attached to getting mental health treatment."

(Tr. 384.) Ms. Taylor continued to diagnose her with PTSD, and her assigned GAF score remained at 55. (Tr. 385.)

The plaintiff underwent a psychiatric evaluation on January 20, 2012, and, through an interpreter, reported that Cymbalta caused "severe nausea" and Zoloft was "ineffective" but that Remeron was "helpful." (Tr. 386.) She reported that her symptoms included "sad mood, [irritability] at times, poor sleep, nightmares, flashbacks, anxiety and worry all the time, hypervigilance, low energy, [and a] sense of fear and impending doom." *Id.* During a mental status examination, she had normal mood and speech, appropriate affect, good insight, intact judgment, and organized and logical thinking. (Tr. 388.) Her intelligence was described as "above average," and she denied hallucinations as well as suicidal or homicidal ideation. *Id.* She was prescribed Remeron for depression and anxiety due to her "past positive experience." (Tr. 389.)

The plaintiff cancelled an appointment on January 30, 2012. (Tr. 420.) At a therapy session on February 9, 2012, Ms. Taylor noted the plaintiff's reports that "it was very hard for her to come to Centerstone" for the appointment and that "she thought about the appointment for three days with increasing anxiety due to the need to leave home (not because of coming to Centerstone itself)." (Tr. 418.) At a follow-up appointment on February 16, 2012, the plaintiff reported that she was taking Remeron as prescribed but that it was causing nausea and headaches. (Tr. 417.) She described the side effects as "tolerable," and her prescribed dosage of Remeron was increased. (Tr. 409-10, 417.) Ms. Taylor observed that the plaintiff was having "difficulty engaging in [the] therapy process." (Tr. 415.)

The plaintiff cancelled her next scheduled appointment and later cancelled appointments scheduled for February 28, and March 1, 2012. (Tr. 411-14.) She returned on March 14, 2012, and

reported that the side effects from medication, including nausea, constipation, and headaches, had become "intolerable" and that she was continuing to have "nightmares, anxiety, flashbacks, feeling[s] of doom, [and] hypervigilance." (Tr. 409.) She was taken off Remeron and prescribed Celexa. (Tr. 410.) At a therapy session the same day, she demonstrated slight improvement towards goals and reported her belief that she was "taking a small step forward by going places with her husband." (Tr. 407.) Ms. Taylor noted that her obstacles included "extreme fear" and "poor motivation." *Id.*

The plaintiff cancelled a scheduled appointment on April 4, 2012, and failed to show for an appointment on April 19, 2012. (Tr. 403-06.) On May 2, 2012, she presented for a medication follow-up and reported that she was compliant with medications and not experiencing side effects. (Tr. 401.) She also reported "slight improvement in her depression and nightmares" but was still experiencing "hypervigilance, constant worry, and fairly frequent nightmares." *Id.* She did not want to increase her medication dosage. *Id.* On May 30, 2012, she reported that she was compliant with medications and not experiencing side effects but had not had a significant decrease in symptoms. (Tr. 399.) She said that she felt better some days but that other days she was "back to her previous self." *Id.* She did not want to increase her dosage of medications (tr. 399), and, following a therapy session, Ms. Taylor observed that the plaintiff "appear[ed] uncertain regarding her commitment to change." (Tr. 397.)

The plaintiff failed to appear for a scheduled appointment on July 10, 2012 (tr. 395), and Ms. Taylor noted that she "ha[d] not been keeping appointments regularly." (Tr. 392.) She was discharged from Centerstone on October 3, 2012, after she "[d]ropped out of treatment," having had no contact with Centerstone in over ninety days. (Tr. 378.) Her diagnosis at the time of discharge

8

remained chronic PTSD.  *Id.*  Ms. Taylor noted that the plaintiff's status at last contact was "fair," that she did not achieve progress during treatment, and that she "had difficulty engaging in therapy and was inconsistent in keeping appointments."  (Tr. 379.)

### B. Hearing Testimony

At the hearing on February 17, 2013, the plaintiff was represented by counsel, and the plaintiff and the vocational expert ("VE"), Rebecca Williams, testified.[4]  (Tr. 8-38.)  The plaintiff testified that she taught English at an elementary school in Iraq for ten years prior to immigrating to the United States in 2009.  (Tr. 14, 16.)  She said that, although she studied the English language as her major in college, she had not "practiced English to the point where she can speak it fluently or have a command of it."  (Tr. 16.)  She testified that she lives with her husband and two children. (Tr. 19.)

The plaintiff testified that she began to have anxiety and depression in Iraq and that she currently receives mental health treatment.  (Tr. 22.)  She explained that she "[does not] want to leave home at all" because her home "makes her feel safe" and that she feels "insecure" and "scared" and is "anxious and depressed for three days in advance" of a scheduled appointment.  (Tr. 23.)  She said that she does not go grocery shopping but will "very rare[ly]" go to a mall or park for her children.  (Tr. 24.)  She said that she gets "stressed" and "scared" in public and "expects that something wrong is going to happen to her children or her husband when they are out."  *Id.*  She testified that her treatment at Centerstone has not helped but that "she is still going there in the hope that one day she would get better."  *Id.*  She said that her mental health problems affect her ability

---

[4] The plaintiff testified through an interpreter.

to work (tr. 22-23) but that she is able to prepare breakfast for her family and uses a computer to communicate with her family in Iraq. (Tr. 24-25.) She said that, if she is unable to get in touch with her family on a particular day, she "expect[s] that something wrong happened to [them] in Iraq." (Tr. 24-25.)

The VE testified that her testimony did not conflict with the Dictionary of Occupational Titles and classified the plaintiff's past work as an elementary school teacher as light and skilled. (Tr. 26-27, 33-34.) The ALJ asked the VE a series of hypothetical questions including only physical impairments (i.e., with no mental impairments), and the VE identified several unskilled jobs that a person with those limitations could perform. (Tr. 27-34.) In response to questioning by the plaintiff's attorney, the VE testified that these jobs would not be available to someone who needed continuous supervision or retraining or who needed to miss at least one day of work per month. (Tr. 34-36.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling in which she made the following findings:

1. The claimant has not engaged in substantial gainful activity since June 22, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: lumbar degenerative disc disease; history of closed fracture, dorsal (thoracic) vertebra without mention of spinal cord injury; and hypothyroidism (20 CFR 416.920(c)).

\*\*\*

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

***

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl.

***

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

***

6.  The claimant was born on November 14, 1975 and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

***

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 22, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 46-54.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R.

§ 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that

the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 46.) At step two, the ALJ determined that the plaintiff has the following severe impairments: "lumbar degenerative disc disease; history of closed fracture, dorsal (thoracic) vertebra without mention of spinal cord injury; and hypothyroidism." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 48.) At step four, the ALJ determined that the plaintiff was not capable of performing her past relevant work. (Tr. 52.) At step five, the ALJ determined that the plaintiff was capable of performing work as a price marker, assembly press operator, and production assembler. (Tr. 53-54.)

### C. The Plaintiff's Assertions of Error

The plaintiff argues that the ALJ erred by: (1) failing to find that her mental condition was a severe impairment; (2) failing to consider whether she had acceptable reasons for failing to follow prescribed mental health treatment; and (3) failing to consider the plaintiff's mental limitations throughout the five steps of the disability determination process. Docket Entry No. 24, at 15-22.

### 1. The ALJ properly considered whether the plaintiff's mental impairment was severe.

The plaintiff argues that the ALJ erred in finding that her mental impairment was not severe at step two of the five-step process. Docket Entry No. 24, at 15-19.

The plaintiff bears the burden at step two of demonstrating that her impairment or combination of impairments is severe. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A severe impairment is one which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c); 416.921. *See also Colvin* 475 F.3d at 730. Basic mental work activities are defined as "the abilities and aptitudes necessary to do most jobs" and include "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision; co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). At step two, the word "'significant' is liberally construed in favor of the claimant," and the Sixth Circuit has "construed the step two severity regulation as a '*de minimis* hurdle' in the disability determination process." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 428 (6th Cir. Feb. 9, 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

In assessing the severity of the plaintiff's mental impairment, the ALJ included written findings based upon the "special technique" delineated at 20 C.F.R. § 416.920a. (Tr. 46-48.) First, as required by 20 C.F.R. § 416.920a(b)(1), the ALJ found that the plaintiff's anxiety disorder was a medically determinable impairment. (Tr. 46-47.) Next, the ALJ rated the plaintiff's functional limitations in the four areas set out in 20 C.F.R. § 416.920a(c)(3). *Id.* The ALJ found that the plaintiff had mild limitations in the activities of daily living, mild limitations in social functioning, mild limitations maintaining concentration, persistence, or pace, and no episodes of decompensation. *Id.* Because the ALJ rated the plaintiff's limitations in the first three functional areas as "mild" and her limitation in the fourth functional area as "none," the ALJ found that the plaintiff's mental

impairment was not severe. *See* 20 C.F.R. § 416.920a(d)(1). *See also Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 653 (6th Cir. 2009)

The plaintiff argues that certain evidence in the record supports a finding that her mental impairment is severe. Docket Entry No. 24, at 15-19. First, she argues that the ALJ erred in assessing Dr. Payne-Gair's opinion. Docket Entry No. 24, at 17-19. In a PRT, Dr. Payne-Gair opined that the plaintiff had moderate difficulties in the areas of maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 293.) In a mental RFC assessment, Dr. Payne-Gair opined that the plaintiff was moderately limited in maintaining attention and concentration for extended periods, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (Tr. 371-72.) She added, however, that the plaintiff was able to "remember locations and simple work-like procedures;" "understand and remember simple and detailed instructions;" "complete simple and detailed tasks;" "maintain attention and concentration for periods of at least two hours;" "adequately maintain workday/workweek and pace;" "make simple decisions;" "relate appropriately to peers and supervisors;" and "adapt to routine workplace changes." (Tr. 373.)

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 416.927(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[5] who has not examined [the claimant] but provides

---

[5] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a).

a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[6] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

---

[6] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[7] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

The ALJ explained her decision to give Dr. Payne-Gair's opinion little weight as follows:

> State agency psychological consultant Celine Payne-Gair, PhD opined that the claimant has mild to moderate mental limitations. Dr. Payne-Gair opined that the claimant can remember locations and simple work-like procedures and can understand and remember simple and detailed instructions; complete simple and

---

[7] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

detailed tasks, maintain attention and concentration for periods of at least two hours, adequately maintain workday/workweek and pace, and make simple decisions; relate appropriately to peers and supervisors; [and] adapt to routine workplace changes . . . . Although Dr. Payne-Gair opined mild to moderate limitations, her specific restrictions appear to indicate only mild impairment. Due to the inconsistency within her own opinion, Dr. Payne-Gair's opinion is given little weight.

(Tr. 48; internal citations omitted.)

The Court concludes that the ALJ appropriately considered Dr. Payne-Gair's opinion. Dr. Payne-Gair is a nonexamining source. *See* 20 C.F.R. § 416.902. Consequently, her opinion is not entitled to controlling weight, and the ALJ was only required to consider her opinion in light of the factors in 20 C.F.R. § 416.927(c). *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight'" and are instead weighed "based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.").

The ALJ found that Dr. Payne-Gair's opinion was internally inconsistent because, while Dr. Payne-Gair checked certain boxes indicating moderate limitations, she also provided specific explanations, which, in the ALJ's view, "appear to indicate only mild impairment." (Tr. 48.) For example, Dr. Payne-Gair checked a box indicating that the plaintiff was moderately limited in maintaining attention and concentration for extended periods (tr. 371) but added a typed note that she could maintain attention and concentration for at least two hours. (Tr. 373.) Similarly, she checked a box indicating that the plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting (tr. 372), yet she added that the plaintiff could adapt to routine workplace changes. (Tr. 373.)

21

Although the plaintiff contends that "the ALJ failed to resolve the inconsistency in Dr. Payne-Gair's assessment" (Docket Entry No. 24, at 17), in the Court's opinion, the ALJ resolved such inconsistency by deciding to give the opinion little weight. Internal inconsistency is an appropriate factor for the ALJ to consider when evaluating a medical opinion, and the ALJ did not err by discounting Dr. Payne-Gair's opinion on this basis. *See* 20 C.F.R. § 416.927(c)(4) (noting that an opinion merits less weight when inconsistent with the record as a whole). *See also Gayheart*, 710 F.3d at 376 (noting that "internal inconsistencies" are a factor to be considered when no treating source opinion receives controlling weight).

The plaintiff also contends that, to the extent that Dr. Payne-Gair's opinion was inadequate or incomplete, the ALJ had a duty to seek clarification or explanation from the doctor. Docket Entry No. 24, at 18. The plaintiff cites a regulation providing that, if a consultative examiner's report is "inadequate or incomplete, [the SSA] will contact the medical source who performed the consultative examination, give an explanation of [its] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20 C.F.R. § 416.919p(b). However, Dr. Payne-Gair is not a consultative examiner, and the ALJ did not find that her opinion was incomplete or inadequate. Rather, in the ALJ's view, her opinion was flawed by inconsistency, and such a flaw does not require the ALJ to seek clarification.

As a second piece of evidence supporting her argument that her mental impairment is severe, the plaintiff contends that the ALJ failed to address a CRG assessment (tr. 257-59) completed by Ms. Taylor at the plaintiff's initial intake assessment at Centerstone on November 16, 2010. Docket Entry No. 24, at 16. In the assessment, Ms. Taylor assigned the plaintiff a GAF score of 55, indicating moderate limitations, and also opined that she had moderate limitations in the following

four functional areas: activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change.  (Tr. 257-59.)

Initially, the Court notes that Ms. Taylor, a licensed clinical social worker, is not an acceptable medical source under the Regulations.  Rather, according to 20 C.F.R. § 416.913(d), she is classified as an "other source," from whom evidence may be used to show the severity of an impairment and its effect on the plaintiff's ability to work.[8]  *See* Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *2-3.  Social Security Ruling ("SSR") 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)).  SSR 06-03p clarified the treatment of "other sources" by explaining that:

---

[8] The Regulations define other sources as:

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 416.913(d)

[a]lthough the factors in 20 CFR 404.1527(c) and 416.927(c) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5. *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06–03p provides that:

[s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative

of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

In this case, the ALJ did not specifically mention the CRG assessment in question; however, it appears that she considered it because she referred to the plaintiff's GAF score of 55, a score which was first assigned by Ms. Taylor on that CRG assessment. (Tr. 47, 259.) The ALJ noted that:

> A score in this range indicates moderate difficulty in social and occupational functioning. . . . However, the GAF score is an un-standardized hypothetical continuum of health. Effectively, it is a snapshot of the instant that a claimant comes to seek medical attention and not indicative of other times. As such, the claimant's GAF score should not necessarily be relied upon for the remainder of the record. Centerstone staff recorded that the claimant had a good prognosis. . . . In subsequent visits, physicians noted that the claimant did not have suicidal or homicidal ideations or hallucinations. They also reported the claimant had an appropriate affect, organized and logical though processes, with her attention, insight, and judgment intact. . . . The claimant also admitted that she follows instructions well, can pay attention and finishes what she starts.

(Tr. 47-48; internal citations omitted.)

As discussed in more detail below, the ALJ also addressed the plaintiff's treatment history at Centerstone, including numerous missed appointments, as indicative of a lack of severe symptoms. (Tr. 48.) The ALJ thoroughly considered the plaintiff's treatment history at Centerstone and appropriately addressed the opinions of Centerstone staff, including Ms. Taylor, that the plaintiff had moderate limitations. In the ALJ's view, the plaintiff's overall treatment history with Centerstone did not align with a finding of moderate limitations. The Court concludes that the ALJ appropriately considered the evidence from Ms. Taylor and Centerstone.

In sum, although the plaintiff points to some countervailing evidence in the record, the Court cannot find reversible error with the ALJ's finding that the plaintiff did not have a severe mental

impairment.  The ALJ did not credit the opinions of Ms. Taylor or Dr. Payne-Gair that the plaintiff had moderate limitations, and the ALJ adequately explained her decision to do so.  In addition, the ALJ also considered the plaintiff's reports that she cares for two children, goes grocery shopping, cooks occasionally, drives, takes care of her personal hygiene, communicates daily with her friends and family, attends family outings and activities with her children, gets along with authority figures, and "has never lost a job because of her social skills."  (Tr. 46-47.)  The ALJ also noted the plaintiff's reports that "she can follow instructions well, pay attention and finish what she starts" as well as her reports that she is able "to pay bills, count change, handle a savings account, and use a checkbook."  (Tr. 47.)

Although the Court may not have reached the same decision, given the *de minimis* threshold for showing a severe impairment at step two, the Court's role is to review whether the ALJ's decision is supported by substantial evidence.  In this case, there is substantial evidence for the ALJ's decision, and the plaintiff has not demonstrated that the ALJ erred.  Moreover, as discussed below, even if the ALJ had wrongly concluded that the plaintiff's mental impairment was not severe, as long as the ALJ finds that the plaintiff suffers from a severe impairment, continues on with the five-step sequential process, and considers all of the plaintiff's impairments in the remaining steps, the error would be harmless.  *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 190-91 (6th Cir. Aug. 27, 2009) ("[A] finding of severity as to even one impairment clears the claimant of step two of the analysis and should cause the ALJ to consider both the severe and non-severe impairments in the remaining steps.").  *See also Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

**2. The ALJ did not err by failing to consider whether the plaintiff had acceptable reasons for failing to follow prescribed treatment.**

The plaintiff argues that the ALJ "failed [to] consider [her] physical, mental, educational, and linguistic limitations as acceptable reasons for failing to follow prescribed treatment in accordance with 20 C.F.R. § 416.930." Docket Entry No. 24, at 19. The plaintiff contends that the ALJ should have evaluated whether her "mental impairments or cultural limitations [were] a mitigating factor associated with her difficulty in following treatment." *Id.* at 20.

In discussing the plaintiff's mental impairments at step two, the ALJ found as follows:

> Centerstone records also reveal that the claimant only sought mental health treatment for five months. . . . Despite continued to reports [*sic*] of psychological stressors to physicians at Precision Pain Center as recent as December 2011, the claimant stopped attending therapy sessions at Centerstone in March 2011. . . . After missing numerous therapy appointments and a lack of treatment for over 90 days, Centerstone released the claimant as a patient in June 2011. . . . The claimant's delay in getting treatment, and lack of compliance once received, indicates a lack of severity. The record does not support that the claimant's mental health cause [*sic*] more than minimal limitation. Accordingly, her mental impairments are not of the nature to preclude all types of work and are considered to be nonsevere.

(Tr. 48; internal citations omitted.)

The Regulations require the plaintiff to follow treatment prescribed by a physician if such treatment is able to restore her ability to work. 20 C.F.R. § 416.930(a). If the plaintiff cannot provide good reasons for failing to follow the prescribed treatment, then she will not be found to be disabled. 20 C.F.R. § 416.930(b). Social Security Ruling 82-59, codified in section 416.930, provides that:

> [a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such "failure" be found to be under a disability.

Soc. Sec. Rul. 82-59. *See also Ranellucci v. Astrue*, 2012 WL 4484922, at *10 (M.D. Tenn. Sept. 27, 2012) (Nixon, J.). Thus, a finding of disability is a prerequisite to the application of 20 C.F.R. § 416.930 and SSR 82-59. *See Ranellucci*, 2012 WL 4484922, at *10 ("[F]ailure to follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore her ability to work.") (quoting *Hester v. Sec'y of Health & Human Servs.*, 886 F.2d 1315, 1989 WL 115632, at *3 (6th Cir. 1989)). *See also* Report and Recommendation entered in *Brewer v. Astrue*, 2010 WL 5488528, at *7 (E.D. Tenn. Dec. 10, 2010) and adopted by the Court ("Finding that a claimant suffers from a disabling impairment is necessary to trigger an analysis under SSR 82-59.").

In addition to using evidence of noncompliance to support a finding of failure to follow prescribed treatment, an ALJ may also use such evidence to assess a plaintiff's credibility regarding the severity of her symptoms. *See Ranellucci*, 2012 WL 4484922, at *10 (noting that SSR 82-59 "does not restrict the use of evidence of noncompliance for the disability hearing") (quoting *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001)). *See also* Report and Recommendation entered in *Carr v. Colvin*, 2013 WL 1309094, at *24-26 (M.D. Tenn. Mar. 12, 2013) and adopted by the Court.

In this case, the ALJ never found that the plaintiff had a disabling mental impairment. Thus, section 416.930 and SSR 82-59 were not implicated. *See Brewer*, 2010 WL 5488528, at *7 (citing *Baker v. Astrue*, 2010 WL 1818045, at *5 (S.D. Ohio Apr. 15, 2010)). Moreover, the ALJ did not find that there was a "failure to follow prescribed treatment" under section 416.930 or SSR 82-59. Rather, the ALJ simply considered the fact that the plaintiff's history of mental health treatment was sporadic and included numerous missed appointments. (Tr. 48.) In the ALJ's own words, "the

[plaintiff's] delay in getting treatment, and lack of compliance once received, indicates a lack of severity." (Tr. 48.) The ALJ appropriately considered the plaintiff's treatment history, or relative lack thereof, in assessing the severity of her alleged impairments.

### 3. The ALJ properly considered the plaintiff's mental impairment throughout her decision.

The plaintiff argues that the ALJ, having found that her mental impairment was not severe at step two, failed to consider her mental impairment in the remaining steps of the five-step process. Docket Entry No. 24, at 21-22. The defendant agrees that the "ALJ did not expressly consider [the plaintiff's] mental impairment in discussing her RFC," but contends that the ALJ "did discuss evidence bearing on [her] mental condition and potential mental limitations." Docket Entry No. 25, at 13.

As noted above, an ALJ's failure to find an impairment severe at step two is not reversible error if the ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination." *Fisk v. Astrue*, 253 Fed. Appx. 580, 583 (6th Cir. Nov. 9, 2007) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). *See also Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 190-91 (6th Cir. Aug. 27, 2009). However, "[w]hen an ALJ determines that one or more impairments is severe, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.''" *Fisk v. Astrue*, 253 Fed. Appx. 580, 583 (6th Cir. Nov. 9, 2007) (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5). *See also White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 787 (6th Cir. Feb. 24, 2009) ("Once one severe impairment is found, the combined effect of all impairments must be

considered, even if other impairments would not be severe."). To do otherwise and fail to consider all of a plaintiff's impairments in the remaining steps of the disability determination process constitutes reversible error.

Thus, courts in this circuit have remanded cases in which an ALJ fails to consider the effects of a non-severe impairment when determining a plaintiff's RFC. *See, e.g., Hicks v. Comm'r of Soc. Sec.*, 2013 WL 3778947, at *2-3 (E.D. Mich. July 18, 2013); *Stephens v. Astrue*, 2010 WL 1368891, at *2 (E.D. Ky. Mar. 31, 2010). However, when an ALJ considers all of a plaintiff's impairments, including non-severe ones, in the remaining steps of the disability determination, reversal is not warranted. *See, e.g., Fisk*, 253 Fed. Appx. at 583-84; *Dodson v. Comm'r of Soc. Sec.*, 2013 WL 4014715, at *2-3 (E.D. Tenn. Aug. 6, 2013).

As set out in detail above, the ALJ thoroughly discussed the medical evidence pertaining to the plaintiff's mental impairment at step two of the five-step process, concluding that her mental impairment caused no more than minimal limitation. (Tr. 46-48.) The rest of the ALJ's decision, however, focuses predominantly on the plaintiff's physical impairments. (Tr. 48-54.) As addressed by the defendant, the ALJ did not specifically mention the plaintiff's anxiety disorder after step two, and, notably, did not include any mental limitations in her hypothetical questions to the VE or in her final RFC determination. (Tr. 27-34, 48.)

The Court is troubled by the ALJ's overwhelming focus on the plaintiff's physical impairments in the latter steps of the disability determination process to the apparent diminution of her mental impairment. The format of the ALJ's decision, in which she addresses the plaintiff's mental treatment history and the opinions of mental health professions in great detail at step two, is partly to blame for this imbalance. Having addressed all of this evidence already in finding that the

plaintiff's mental impairment was not severe, the ALJ was perhaps disinclined to revisit it. The ALJ was nevertheless required to consider what effect plaintiff's mental impairment has on her RFC.

Upon close review of the ALJ's decision, however, it is apparent that the ALJ did consider the plaintiff's alleged mental impairments in determining her RFC. In assessing the plaintiff's credibility, the ALJ noted that her testimony was frequently inconsistent regarding the severity of her symptoms. (Tr. 51.) Several of these symptoms related to the plaintiff's alleged mental impairment. For example, the plaintiff testified that she feels "insecure" and "scared" in public and that she does not go grocery shopping and very rarely goes to a mall or park. (Tr. 23-24.) However, the ALJ noted that, in disability function reports,[9] the plaintiff indicated that she shops once a week with her husband for approximately one hour and goes to the gardens on a weekly basis. (Tr. 146-53, 164-71.) Similarly, the ALJ noted that, while the plaintiff testified that she cooks breakfast regularly, she indicated in a disability function report that she does not cook. (Tr. 24, 51, 166.) The ALJ also noted the plaintiff's reports that she was able to care for her children, pay bills, count change, handle a savings account, and use a checkbook. (Tr. 51.) The ALJ found that the plaintiff's "inconsistencies and activities are not consistent with [the] severity of the symptoms that she initially alleged." *Id.*

Thus, the ALJ did evaluate some of the alleged effects of the plaintiff's mental impairment but found her allegations of severe symptoms not credible. The ALJ should have more clearly delineated her discussion of the plaintiff's credibility between physical and mental impairments. However, the plaintiff clearly alleged the impairments above, particularly her fear of leaving her

---

[9] The Court notes that these disability function reports alleged both physical and mental limitations. (Tr. 146-53, 164-71.)

house, as stemming from her mental impairment. Because the ALJ did not credit the opinion evidence related to the plaintiff's mental impairment, the plaintiff's credibility as to her subjective symptoms was a critical factor in this case. The ALJ concluded that her subjective reports were not credible, and, therefore, did not include any mental limitations in the RFC. When coupled with the ALJ's prior determination that the plaintiff's mental impairment causes no more than minimal limitations, it is apparent that the ALJ simply did not accept that the plaintiff has a mental impairment affecting her ability to work. This conclusion is supported by substantial evidence in the record.

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 23) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge